FILED
United States Court of Appeals
Tenth Circuit

July 7, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ERMOND OVERTON,

    Defendant - Appellant.

No. 20-2129
(D.C. No. 1:17-CR-03564-KWR-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BRISCOE**, and **PHILLIPS**, Circuit Judges.
_____

Ermond Overton robbed an Albuquerque bank without violence or fanfare. He passed a note to the teller demanding money and advising that he had a gun. Yet this bank robbery was unusual in one key respect—Overton wanted to be arrested. Under long-held delusions and recent methamphetamine use, Overton feared imagined pursuers threatening his life, so he sought out the safety of incarceration.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

He was later charged and convicted with one count of bank robbery. The trial judge sentenced him to 63 months' imprisonment—the upper-end of his advisory guideline range of 51 to 63 months. On appeal, Overton argues that his 63-month sentence is substantively unreasonable given his genuine, albeit delusional, beliefs about his pursuers.

We hold that the district court acted within its discretion in imposing a 63-month sentence. Accordingly, we affirm.

## BACKGROUND

I. **Factual History**

"Robbing a bank saved my life." R. vol. 2 at 43. Or at least that's how Overton puts it. For him, the robbery was his only chance at safety from the people who had been following him for over a year, trying to kill him.[1]

Beginning in December 2016, Overton reported to police that a man with a gun was following him. He even set fire to his own apartment, allegedly to force out a couple who he believed was threatening him and causing others to follow him. But, according to Overton, nothing seemed to shake his followers off his tracks.

Later that month, with his imaginary pursuers on his tail, Overton fled from Albuquerque, New Mexico, to Austin, Texas, where his mother and two brothers lived. Overton's brother reported that Overton showed up at his door stating that

---

[1] Because the district court granted the government's motion in limine to exclude references to Overton's persecutory delusions during trial, we draw our facts pertaining to his mental illness primarily from the district court's memorandum opinion and order and the presentence investigation report.

someone was after him. Yet, even in Texas, Overton believed that his supposed pursuers had found him, claiming that there were people in the trees outside his window. After a year of this behavior, Overton's mother asked him to leave.

On December 7, 2017, just days after being asked to leave, Overton reported three times to government officials that he was being followed, first to the Albuquerque police department and then to security guards at a nearby state courthouse. In his last attempt, he arrived at a federal courthouse, requesting assistance from the security guards. They offered to call the police department or to escort him to the bus stop. But he was unsatisfied with their offers and was desperate for more protection. So he left.

On his way out of the courthouse, Overton requested a pen and paper. On the paper he wrote, "Give me all your money I have a gun." *Id.* vol. 4 at 105. He informed the guards that he was going across the street to rob a bank and that they would "hear[] from him soon." *Id.* vol. 2 at 109; *id.* vol. 4 at 251. Overton testified that he thought showing the note to the guards would cause them to "stop [him] from going to commit that crime and give [him] the protection that [he] wanted." *Id.* vol. 4 at 252. But when that didn't work, he walked across the street to Wells Fargo Bank. The courthouse guards phoned the police after seeing him walk into the bank.

Inside the bank, Overton got in line to speak with a bank teller. When his turn came, without saying a word, he put the note on the teller's counter. The teller read the note and was understandably frightened. She noticed that one of Overton's hands

3

was hidden from view and that he carried a bag across his chest. His expression was "[s]erious." *Id.* at 108.

Believing that Overton had a gun, the teller gave him all the money in her till—$896. Overton put the money in his pocket, slowly leaving the bank. He testified that he had nowhere to go, but the bank teller saw him walking down the street toward the federal courthouse.

Soon the police arrived and arrested him. Police searched his belongings and found $896 in cash. But they never retrieved a gun. Later, in an interview with the FBI, Overton waived his *Miranda* rights and confessed to robbing the bank. He explained that he was just trying to seek help to escape his pursuers. His stories were never corroborated, and it was later determined that he was a diagnosed paranoid schizophrenic suffering a persecutory delusion[2] at the time of the robbery.

## II.    Procedural History

In 2017, a federal grand jury charged Overton with one count of bank robbery in violation of 18 U.S.C. § 2113(a).

Before trial, defense counsel proposed that a psychologist, Dr. Christine Johnson, testify as an expert about Overton's psychological condition. For the court's consideration, Dr. Johnson created a report detailing Overton's psychological history as well as her own evaluation of his mental condition. She noted that by Overton's

---

[2] As stated by the defense's psychologist, Dr. Christine Johnson, "[t]he nature of persecutory delusional thinking is such that the belief in danger, although irrational, is firmly held and not amenable to reasoning." R. vol. 2 at 27–28 (citation omitted).

own account, he had previously been prescribed several psychiatric medications, including drugs for psychotic behavior, depression, and anxiety. He also regularly took Adderall, a "highly addictive" drug typically used to treat Attention Deficit Hyperactivity Disorder, for which Dr. Johnson found no record of a prescription. R. vol. 2 at 39. Further, she reported his prior diagnoses of "paranoid schizophrenia," "bipolar disorder," "methamphetamine use disorder," "psychosis—meth induced," and "antisocial personality disorder traits." *Id.* at 40–41.

In conducting her own analysis, Dr. Johnson acknowledged that Overton's psychological symptoms might have been complicated by his use of stimulant drugs. In fact, she noted that for the night before the robbery, Overton reported having stayed up all night to smoke methamphetamine and still being "amped up" the day of the robbery. *Id.* at 42–43. And she observed that leading up to the robbery, Overton had experienced sincere "persecutory delusions involving persons involved with the cartel." *Id.* at 44–45. She also noted that at the time of the robbery, Overton was "desperately looking for protection from law enforcement" because he was "convinced that his life was in danger." *Id.* at 48. Dr. Johnson ultimately diagnosed Overton with a "chronic psychotic mental disorder combined with a substance abuse/addiction problem." *Id.* at 48. But she separately noted that "there were indications that [Overton] was exaggerating some psychiatric symptoms (e.g., psychosis) during [the] interview, and also in testing." *Id.* at 45.

The government objected to the defense's use of evidence about Overton's psychological condition at trial—including Dr. Johnson's testimony. It argued that a

5

defendant's reasons for committing a crime "are factors that go to punishment rather than to guilt or innocence" and that this evidence should instead be considered at sentencing. *Id.* vol. 1 at 69. The court agreed. Though acknowledging that "Defendant's belief was a persecutory delusion," the court noted that evidence of Overton's mental condition wasn't relevant to the commission of this general intent crime, nor could it be used to support a duress defense. *Id.* at 85, 91, 94–95. Accordingly, it excluded this evidence at trial. The case proceeded and a jury convicted Overton in March 2020.

At sentencing, the court calculated an advisory imprisonment range of 51 to 63 months, based on a total offense level of 22 and a criminal-history category of III. Overton requested a downward variance based on his mental-health condition and Dr. Johnson's conclusions. He argued that his paranoid delusions drove the crime, diminishing any need for deterrence or retribution. To that end, he argued that he lacked intent to intimidate anyone at the bank, he didn't carry a weapon, and he cooperated with law enforcement's investigation.

After considering Overton's arguments, the district court declined to vary downward and sentenced him to 63 months' imprisonment, followed by 3 years of supervised release. In issuing its sentence, the district court noted that it considered all the factors under 18 U.S.C. § 3553(a), including "the seriousness of the offense; promoting respect for the law; just punishment; deterrence; protecting the public; and providing adequate care, treatment, or training for Mr. Overton." *Id.* vol. 4 at 397. And in doing so, it determined that a 63-month sentence was "sufficient but not

greater than necessary to promote the goals of sentencing." *Id.* Overton appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

Overton presents one issue on appeal: whether his 63-month sentence is substantively unreasonable given his persecutory delusions. "[S]ubstantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (internal quotation marks and citation omitted). We review the reasonableness of the district court's sentencing decision under an abuse-of-discretion standard, meaning that we reverse only if the sentence "exceeded the bounds of permissible choice," or was "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018) (internal quotation marks and citations omitted). In conducting this review, "[w]e may not examine the weight the district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed do novo." *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). And because the sentence is within the Guidelines range, we presume that it is reasonable. *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) (citation omitted).

In imposing a sentence, a court must consider the seven statutory factors set forth in § 3553(a). Two factors are at issue here. These factors have been summarized as follows:

1. The nature and circumstances of the offense and the history and characteristics of the defendant; [and]

2. the need for a sentence to reflect the seriousness of the crime, deter future criminal conduct, prevent the defendant from committing more crimes, and provide rehabilitation.

*Barnes*, 890 F.3d at 915 (citing 18 U.S.C. § 3553(a)(1–2)).

Overton raises several complaints about how the district court handled these factors: first, that the nature of the robbery was "comparatively non-serious"; second, that Overton's mental-health history of "persecutory delusions substantially mitigate[d] his culpability"; and third, that his high-end sentence can't be justified on grounds of protecting the public. Appellant's Opening Br. at 8–11. The government counters that these arguments "fail[] to show how the district court's sentence 'exceeds the bounds of permissible choice.'" Appellee's Br. at 9 (citing *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013)). We agree. We therefore conclude that the district court acted within its discretion in imposing Overton's 63-month sentence.

## I.  Seriousness of the Robbery

Overton first argues that in considering the "nature and circumstances of the offense," § 3553(a)(1), his robbery was relatively "non-serious" compared to other bank robberies. Appellant's Opening Br. at 8. For support, he points out that during the robbery he wasn't armed, he didn't hurt anyone, and he peacefully took the money and exited the bank. And he notes that after completing the robbery, he voluntarily cooperated with law enforcement and confessed.

As a preliminary matter, Overton defines the "spectrum" of comparator bank robberies too broadly, to include even those bank robberies that involved a dangerous weapon. *See id.* (noting that the robbery was "comparatively non-serious," in part, because "Overton was not armed"). Yet bank robberies involving the possession or brandishing of a dangerous weapon receive an additional three offense levels (five levels for a firearm)—an enhancement that Overton didn't receive. *See* U.S.S.G. § 2B3.1(b)(2)(C), (E). Thus, because his lack of a firearm was already factored into his sentencing range, it does little to support his claim that he committed a comparatively "non-serious" robbery.

Even still, Overton contends that unlike his own robbery, other unarmed bank robbers often create danger by assaulting, terrorizing, or kidnapping others. He notes that he did none of these things. But this doesn't make the district court's conclusion unreasonable. Indeed, Overton in his note advised the teller that he had a firearm: "Give me all your money I have a gun." R. vol. 4 at 105. And the teller testified that one of Overton's hands was hidden from view as he stood at the counter and that he had a bag strapped across his chest. Unsurprisingly, the teller took him at his word and believed his note to be true. The mere threat of a weapon inflicted danger to all the bank patrons and workers involved. *See United States v. Metzger*, 233 F.3d 1226, 1228 (10th Cir. 2000) (noting that even in the context of unarmed bank robberies, "[i]t is plain that [t]he violent nature of the offense of bank robbery carries with it the inherent prospect that someone could be injured in the robbery or its aftermath" (second alteration in original) (internal quotation marks and citation omitted)).

9

And to the woman working as the teller, the robbery was extremely serious, leaving her with lasting effects. During the robbery, she feared for her life, sincerely wondering whether she or a patron would be shot or even whether she'd see her family again. Even nearly two-and-a-half years later, the teller stated that she is coping with the trauma, explaining that she is "suspicious" of new faces that she doesn't recognize at the bank. *Id.* vol. 2 at 112. Overton's benign, yet unknown, subjective intent meant little to a woman who reasonably feared for her life. For these reasons, the district court was under no obligation to view Overton's robbery as "comparatively non-serious" in its sentencing decision.

## II. History of Mental Illness

In considering the "history and characteristics of the defendant," § 3553(a)(1), Overton contends that his mental illness substantially mitigates his culpability. He argues that his persecutory delusions were "unquestionably real" and that it was his deathly fear of his pursuers that drove him to make the "desperate but ill-considered decision to rob the bank." Appellant's Opening Br. at 9. And because his mental illness was the ultimate motivator for his behavior, he says that punishment would do little to deter or rehabilitate him.

Though we agree that a defendant's mental illness could justify a downward variance, we disagree that the court's contrary decision in this case "exceeded the bounds of permissible choice." *Barnes*, 890 F.3d at 915 (internal quotation marks and citation omitted). At bottom, Overton requests that we assign more weight to this § 3553(a) factor than did the district court. But "the weight a district court assigns to

10

various § 3553(a) factors, and its ultimate assessment of the balance between them,"
is not a legal conclusion that we review de novo. *Smart*, 518 F.3d at 808. "The
sentencing judge is in a superior position to find facts and judge their import under
§ 3553(a) in the individual case. The judge sees and hears the evidence, makes
credibility determinations, has full knowledge of the facts and gains insights not
conveyed by the record." *Gall*, 552 U.S. at 51 (citation omitted). Here, the district
court received detailed briefing about Overton's mental-health status. And in
"review[ing] . . . all of the information provided," it determined that the 63-month
sentence "[was] appropriate and sufficient, but not greater than necessary to promote
the goals of justice and the goals of sentencing." R. vol. 4 at 398.

It's true that the district court acknowledged that Overton was experiencing a
sincere "persecutory delusion." *Id.* vol. 1 at 85 (footnote omitted). But the district
court had reason to give more weight to other § 3553(a) factors. After all, Overton's
choice to engage in a serious crime cannot go unnoticed. Added to that, his several
prior convictions—including an attempted armed bank robbery—suggest that he
posed a large risk to society.[3] And even if we agreed with Overton's argument, "[t]he
fact that the appellate court might reasonably have concluded that a different
sentence would be appropriate is insufficient to justify reversal of the district court."
*Gall*, 552 U.S. at 51. Overton has failed to demonstrate that the district court's

---

[3] We needn't consider the government's argument that Overton's delusions could be attributed in part to his history of drug abuse. Regardless of the source of his delusions, the district court recognized that they were sincere, but nonetheless attributed more weight to other § 3553(a) factors.

decision was outside the "range of reasonable sentences." *United States v. Martinez-Barragan*, 545 F.3d 894, 904 (10th Cir. 2008) (citation omitted).

## III. Protecting the Public

Overton alleges that his high-end sentence can't be justified on grounds of protecting the public under § 3553(a)(2)(C). He argues that his previous convictions are "dated" and have little bearing on the future risk he poses to the public. Appellant's Reply Br. at 4; Appellant's Opening Br. at 11. But his argument again falls short.

To start, his previous convictions, though "dated," still matter. By his own account, he has been incarcerated off and on "for approximately 26 years since age 18." R. vol. 2 at 121. Previously, he was sentenced to 90 months' imprisonment for his involvement in an attempted armed bank robbery together with 60 consecutive months for facilitating a crime of violence. Overton admitted to being the "mastermind" of that robbery and a string of others, stating that as a gang leader, he personally recruited other gang members to rob banks. *Id.* at 115. And in that robbery, a bank patron was shot twice in the leg.

Following Overton's release, he was sentenced to another 36 months' imprisonment for failing to comply with his supervised-release conditions. Back in prison, Overton used a sharpened metal object to stab another inmate that was bullying him. That earned him an additional 46 months for possessing a prohibited weapon in prison.

We acknowledge that many of his offenses occurred when he was younger. But due to their violent nature and the risk of harm they posed to the public, we don't doubt the sentencing judge's concerns. What's more, Overton's choice to commit the instant offense presented a severe danger to the public. *United States v. Lewis*, 628 F.2d 1276, 1279 (10th Cir. 1980) (declaring that bank robbery is "so unambiguously dangerous to others" (internal quotation marks and citation omitted)). It was therefore reasonable for the judge to impose a high-end sentence on grounds of Overton's risk to the public.

In short, though Overton's mental health makes this case unique, "the uniqueness of the individual case . . . does not change the deferential abuse-of-discretion standard of review that applies to all sentencing decisions." *Barnes*, 890 F.3d at 916 (alteration in original) (citation omitted). Taken as a whole, the district court acted within its discretion in imposing a 63-month sentence that was "sufficient, but not greater than necessary to promote the goals of justice and the goals of sentencing." R. vol. 4 at 398.

## CONCLUSION

We AFFIRM Overton's sentence.

Entered for the Court

Gregory A. Phillips
Circuit Judge